**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TAX LIEN LAW GROUP, LLP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **JURY DEMANDED** |
| **WOODS COVE II, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Tax Lien Law Group, LLP ("TLLG"), by its attorneys, Alan R. Dolinko, Robert S. Michaels and Robert L. Margolis of Robinson Curley & Clayton, P.C., complains against Defendant Woods Cove II, LLC ("WC II") as follows:

**PARTIES**

1.      TLLG is an Illinois limited liability partnership engaged in the practice of law, with its principal place of business in Chicago, Illinois.  TLLG's sole equity partner is Mark Schwartz, an Illinois citizen and domiciliary, and its sole income partner is Kirk Liederbach, an Ohio citizen and domiciliary.  TLLG was also registered to do business in Ohio as the Law Office of Brady, Liederbach, and Associates, and maintained a local office in Cleveland, Ohio.

2.      WC II is a Delaware limited liability company that invests in real property tax liens.  WC II's sole member is Woods Cove Holdings, LLC, another Delaware limited liability company, the members of which are Delaware limited liability companies One Oak, LLC, Long Ball Partners, LLC, Imperial Capital Group Holdings, LLC, and Imperial Capital Asset Management, LLC.  One Oak LLC's sole member is Connecticut citizen and domiciliary David W. Schwartz.  Long Ball Partners LLC's, Imperial Capital Group Holdings, LLC's and Imperial

Capital Asset Management, LLC's members are California citizens and domiciliaries Randall E. Wooster and Jason W. Reese.

## SUBJECT MATTER JURISDICTION AND VENUE

3.        This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), as Plaintiff is diverse from Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.        Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2).

## FACTS

5.        Certain cities and counties in the United States sell the right to collect unpaid real property taxes to investors.  Investors obtain tax liens or certificates against the delinquent taxpayers and enforce their rights by following state statutory procedure, culminating, if necessary, in a foreclosure action against the real property on which the taxes are due.  State law also lets these investors collect certain legal fees from delinquent taxpayers, which accrue as the enforcement process proceeds. The total fees allowed increase at the time of designated statutory milestones, such as the docketing of a foreclosure action or the issuance of statutorily-required notices.  To cancel or "redeem" a tax lien or certificate, a taxpayer must pay the investor all unpaid taxes, plus the allowed fees and costs that have accrued up to the point of redemption.  If a tax lien certificate is not redeemed, the investor can obtain title to the real property through foreclosure.  Investors often buy real property tax lien certificates in bulk.

6.        TLLG represents real property tax lien certificate investors in collection and enforcement matters, including foreclosure lawsuits.  TLLG opens a file for each of its clients' certificates and sends the required notices to taxpayers and county treasurers to begin the collection/enforcement process.  TLLG also monitors local court dockets for taxpayer

bankruptcy filings or mortgage foreclosure actions, as well as for notices of condemnation, demolition or code violations, and represents its clients in connection with any such proceedings. At the time permitted by state statute, TLLG files and prosecutes foreclosure actions for its clients against taxpayers who have failed to redeem, and, where appropriate, negotiates settlements and payment plans with such taxpayers. TLLG also represents clients in negotiating the purchase of real property tax lien certificates from local governments.

7. TLLG typically charges its clients the same fees that counties (following state law guidelines) allow investors to recover from taxpayers. While, as noted above, these fees accrue at certain milestones in the enforcement process, they help to compensate TLLG for more than the work immediately connected with completing that particular milestone task itself. First, reaching each milestone requires ongoing and escalating legal work as described in paragraph 8 above, at least some of the value of which is wrapped into the milestone-specific fees. Second, TLLG's clients buy tax lien certificates in bulk, and most certificates will be redeemed during the statutory redemption period, well before any statutory fees accrue and are collectible from taxpayers. Because it is not possible to determine when any particular certificate will be redeemed, TLLG must create files for and begin processing and monitoring all certificates as described in paragraph 8 above. The milestone-triggered fees collected on the portion of certificates that redeem later or are paid after a sheriff's sale thus help to carry or finance the work required on certificates that redeem earlier. In addition to statutory milestone-based fees, TLLG typically charges its clients hourly fees for case-specific work in bankruptcy, foreclosure and other matters.

8. Between October 2011 and August 2013, TLLG represented WC II in collecting and enforcing more than 8,800 real property tax lien certificates in Ohio and more than 1,000

certificates in Maryland. Among other things, TLLG: a) created electronic files for each certificate; b) sent required notices to taxpayers and county or municipal treasurers; c) monitored local court dockets for bankruptcy, mortgage foreclosure or other relevant filings, and represented WC II in any such actions as necessary; d) at the time permitted by statute, initiated and prosecuted foreclosure actions on certificates that had not yet been redeemed; e) for certificates in certain counties, established and staffed two live telephone lines, and an off-hours answering service, with staff and attorneys available both during regular business hours and on evenings and weekends, to handle inquiries from taxpayers, lenders, county officials and others for the life of each lien; f) negotiated settlements and payment plans with taxpayers, as appropriate; g) represented WC II in purchasing its Cuyahoga County, Ohio certificates; h) monitored court dockets, incoming calls and correspondence, accounted for WC II legal payoffs and redemptions, prepared notices of intent, legal pleadings and affidavits and attended court hearings on WC II's Ohio and Maryland matters; and i) advanced certain court filing, publication, sheriff's and other costs.

9.     The approximate value of the legal services TLLG provided to WC II is the total of: a) the statutory milestone-specific fees incurred on certificates that reached such milestones; b) approximately $50,000 per month for the file-opening, monitoring, call center, and other background services described in paragraph 8 above on certificates that have not reached any statutory fee milestones; c) hourly fees incurred in bankruptcy or other matters at rates of $450 for partners, $325 for associates, and $110 for paralegals; and d) the face amount of all advanced costs.

10.     TLLG performed legal services in connection with WC II's Ohio real property tax lien certificates pursuant to an agreement titled "Tax Lien Foreclosure Retention Agreement –

Ohio" ("WC II Ohio Agreement"), a true and correct copy of which is attached as Exhibit A and incorporated herein by reference. In February 2012, TLLG issued this agreement and sent it to David Schwartz and Jason Reese, the principals behind WC II, each of whom orally agreed to its terms and promised to TLLG, both orally and in writing, that they would cause it to be signed. The WC II Ohio Agreement required WC II to pay TLLG statutorily permissible flat fees – listed in an attached schedule – for work performed up to each milestone in the collection process, plus hourly fees for certain variable services (e.g., representing WC II in taxpayer bankruptcy cases). The WC II Ohio Agreement provided that TLLG would advance litigation expenses except for court filing, publication and sheriff's costs; WC II was to pre-pay those expenses with a cost retainer. The WC II Ohio Agreement also made clear that it was not a contingent fee arrangement; even though, in many instances, the milestone-based fees would be paid by taxpayers, WC II remained primarily responsible for payment, irrespective of any such third-party recovery. The Ohio 2010 Agreement also stated that if WC II terminated TLLG, WC II "agrees to remit payment promptly following presentation of any invoice for fees and costs incurred during the representation." Pursuant to the WC II Ohio Agreement, TLLG periodically invoiced WC II to fund the required cost retainer and WC II timely paid those invoices.

11. TLLG performed legal services in connection with WC II's Maryland real property tax lien certificates pursuant to an agreement titled "Tax Lien Foreclosure Retention Agreement – Maryland" ("WC II Maryland Agreement"), a true and correct copy of which is attached as Exhibit B and incorporated herein by reference. In February 2012, TLLG issued this agreement and sent it to David Schwartz and Jason Reese, the principals behind WC II, each of whom orally agreed to its terms and promised, both orally and in writing, that they would cause it to be signed. The WC II Maryland Agreement was substantively identical to the WC II Ohio

Agreement, described in paragraph 10 above (although the fee schedule was adjusted to comply

with Maryland law).  Pursuant to the WC II Maryland Agreement, TLLG periodically invoiced

WC II to fund the required cost retainer and WC II timely paid those invoices.  A true and

correct copy of the WC II Maryland Agreement is attached as Exhibit B and incorporated herein

by reference.

12.    In April 2013, WC II decided to begin transitioning its attorney-client relationship

away from TLLG.  In August 2013, WC II formally terminated its attorney-client relationship

with TLLG for all WC II legal matters in Ohio and Maryland.  WC II still, however, owes

substantial sums to TLLG for past legal services rendered, and has refused TLLG's multiple

demands for payment.  As of August 2, 2013, WC II owes TLLG $2,955,708.51 in billed fees

and costs net of costs advanced by WC II.  The full value of TLLG's services exceeds that

amount.

<b><u>CLAIMS FOR RELIEF</u></b>

<b>Count I<br>Breach of Contract<br>(WC II Ohio Agreement)</b>

13.    TLLG realleges paragraphs 1 through 12 above and incorporates them by

reference in this Count I.

14.    TLLG and WC II entered into the WC II Ohio Agreement.  TLLG performed all

of its obligations and conditions precedent on its part as required by that agreement.  WC II paid

TLLG for some, but not all, of the services TLLG performed.  TLLG demanded that WC II pay

for those remaining services, but WC II has failed and refuses to do so.  WC II has thereby

breached the WC II Ohio Agreement with TLLG, causing injury to TLLG in the amount of the

6

unpaid fees and costs.  As of August 2, 2013, WC II owes TLLG $2,625,254.96 under the WC II

Ohio Agreement.

WHEREFORE, TLLG respectfully requests that judgment be entered in its favor and

against Woods Cove II, LLC as follows:

(a)     for compensatory damages in the amount of $2,625,254.96 under the WC II Ohio

        Agreement;

(b)     for pre-judgment interest at the appropriate rate under the Illinois Interest Act

        (815 ILCS § 205/2) based on WC II's failure to pay sums due under its written

        agreements with TLLG and based on WC II's' unreasonable and vexatious delay

        and refusal to pay;

(c)     for any other relief this court deems just and proper.

## Count II
## Breach of Contract
## (WC II Maryland Agreement)

15.     TLLG realleges paragraphs 1 through 12 above and incorporates them by

reference in this Count II.

16.     TLLG and WC II entered into the WC II Maryland Agreement.  TLLG performed

all of its obligations and conditions precedent on its part as required by that agreement.  WC II

paid TLLG for some, but not all, of the services TLLG performed.  TLLG demanded that WC II

pay for those remaining services, but WC II has failed and refuses to do so.  WC II has thereby

breached the WC II Maryland Agreement with TLLG, causing injury to TLLG in the amount of

the unpaid fees and costs.  As of August 2, 2013, WC II owes TLLG $330,453.55 under the WC

II Maryland Agreement.

WHEREFORE, TLLG respectfully requests that judgment be entered in its favor and against Woods Cove II, LLC as follows:

(a)      for compensatory damages in the amount of $330,453.55 under the WC II Maryland Agreement;

(b)      for pre-judgment interest at the appropriate rate under the Illinois Interest Act (815 ILCS § 205/2) based on WC II's failure to pay sums due under its written agreements with TLLG and based on WC II's' unreasonable and vexatious delay and refusal to pay;

(c)      for any other relief this court deems just and proper.

**Count III**
**Unjust Enrichment**
**(In the Alternative to Counts I and II)**

17.      TLLG asserts this unjust enrichment claim against WC II in the alternative to its claims in Counts I and II above, and only to the extent that WC II denies the existence of either the WC II Ohio Agreement or the WC II Maryland Agreement. TLLG realleges paragraphs 1 through 9 and paragraph 12 above and incorporates them by reference in this Count III.

18.      Between October 2011 and the present, TLLG provided valuable legal services to WC II related to that entity's real property tax lien certificates in Ohio and Maryland. While WC II benefitted from all of TLLG's legal services, it has paid WC II for only a portion of those services. As of August 2, 2013, the value of the services that WC II received from TLLG but has not paid for is $2,955,708.51 in billed fees plus $1,100,000 for dedicated ancillary legal services at a value of $50,000 per month.

19.      WC II has thus unjustly retained benefits worth at least $4,055,708.51 to the detriment of TLLG. Allowing WC II to retain those benefits without paying at least

8

$4,055,708.51 to TLLG violates the fundamental principles of justice, equity and good conscience.

WHEREFORE, TLLG respectfully requests that judgment be entered in its favor and against Woods Cove II, LLC as follows:

(a)     for compensatory damages in an amount of not less than $4,055,708.51;

(b)     for pre-judgment interest at the appropriate rate under the Illinois Interest Act refusal to pay;

(c)     for any other relief this court deems just and proper.

Respectfully submitted,

**TAX LIEN LAW GROUP, LLP**

Dated: August 9, 2013          By:      /s/Alan R. Dolinko

One of its attorneys

Alan R. Dolinko (6193228)
Robert Michaels (6203462)
Robert L. Margolis (6226941)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Suite 1700
Chicago, Illinois 60606
adolinko@robinsoncurley.com
rmichaels@robinsoncurley.com
rmargolis@robinsoncurley.com
312.663.3100 – telephone
312.663.0303 – fax